No. 25-10259

◆

# In the United States Court of Appeals for the Fifth Circuit

◆

BRITTNEY KENNEDY, INDIVIDUALLY AND AS SURVIVING SPOUSE, ON BEHALF OF MINOR M.S.K. AND AS ANTICIPATED PERSONAL REPRESENTATIVE OF THE ESTATE OF MARQUIS KENNEDY,

*Plaintiff – Appellant*

v.

CITY OF ARLINGTON, TEXAS; SHELLY BATEMAN; JONATHAN P. BUCEK; RICHARD COLEMAN; TYLER FERRELL; PATRICK KNIGHT; DAVID KURBINSKY; MICHAEL LEONESIO; LEONARD RAY; RONNIE MCCOY; BOBBY MUGUEZA; OFFICER NORWOOD; CONNOR SHANAHAN; SEAN WHEATLEY; JASTIN D. WILLIAMS; BRADLEY MCNULTY,

*Defendants – Appellees.*

◆

On Appeal from the United States District Court for the Northern District of Texas, Fort Worth Division

────────────

**DEFENDANT-APPELLEE CITY OF ARLINGTON, TEXAS' BRIEF**

────────────

JOSHUA A. SKINNER
    joshua.skinner@arlingtontx.gov
CYNTHIA WITHERS
    cynthia.withers@arlingtontx.gov
ALEXANDER J. LINDVALL
    alexander.lindvall@arlingtontx.gov
*Assistant City Attorneys*

CITY OF ARLINGTON
CITY ATTORNEY'S OFFICE
Post Office Box 90231, MS 63-0300
Arlington, Texas 76004-3231
(817) 459-6878

*Counsel for the City of Arlington, Texas*

No. 25-10259

——————◆——————

BRITTNEY KENNEDY, INDIVIDUALLY AND AS SURVIVING SPOUSE, ON BEHALF OF MINOR M.S.K. AND AS ANTICIPATED PERSONAL REPRESENTATIVE OF THE ESTATE OF MARQUIS KENNEDY,

*Plaintiff – Appellant*

v.

CITY OF ARLINGTON, TEXAS; SHELLY BATEMAN; JONATHAN P. BUCEK; RICHARD COLEMAN; TYLER FERRELL; PATRICK KNIGHT; DAVID KURBINSKY; MICHAEL LEONESIO; LEONARD RAY; RONNIE MCCOY; BOBBY MUGUEZA; OFFICER NORWOOD; CONNOR SHANAHAN; SEAN WHEATLEY; JASTIN D. WILLIAMS; BRADLEY MCNULTY,

*Defendants – Appellees.*

——————◆——————

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiff-Appellant | Plaintiff-Appellant's Counsel |
| --- | --- |
| Brittney Kennedy, individually and as surviving spouse, on behalf of minor M.S.K. and as anticipated personal representative of the Estate of Marquis Kennedy, | Shelby J. White<br>Thad D. Spalding<br>DURHAM, PITTARD & SPALDING, LLP<br><br>Roland Witherspoon<br>WITHERSPOON LAW |

| Defendants-Appellees | Defendants-Appellees' Counsel |
| --- | --- |
| City of Arlington, Texas | Cynthia Withers<br>Joshua A. Skinner |

i

Alexander J. Lindvall
*Assistant City Attorneys*
CITY OF ARLINGTON
CITY ATTORNEY'S OFFICE

Shelly Bateman, Jonathan P. Bucek,
Richard Coleman, Tyler Ferrell,
Patrick Knight, David Kurbinsky,
Michael Leonesio, Leonard Ray,
Ronnie McCoy, Bobby Mugueza,
Officer Norwood, Connor Shanahan,
Sean Wheatley, Jastin D. Williams,
Bradley McNulty

Thomas P. Brandt
Christopher D. Livingston
THOMPSON, COE, COUSINS
& IRONS, LLP

*/s/ Joshua A. Skinner*
JOSHUA A. SKINNER

## STATEMENT REGARDING ORAL ARGUMENT

Appellee believes the facts and legal arguments in this case are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument. However, in the event the Court grants oral argument, Appellee requests the opportunity to present oral argument.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ....................................................... iii

Table of Contents ..................................................................................... iv

Table of Authorities ................................................................................. vi

Issues Presented ......................................................................................... 1

Statement of the Case ................................................................................ 2

I.   Mr. Kennedy was an employee of the City of Arlington being
     trained at the Arlington Police Academy to become a police
     officer. ............................................................................................... 2

II.  Ten weeks into a sixteen-week training program, Mr. Kennedy
     participated in a self-defense simulation as part of his police
     training. .............................................................................................. 6

III. During the self-defense simulation, Mr. Kennedy suffered a
     heart-related medical emergency, and passed away a couple
     days later. ......................................................................................... 11

IV.  Plaintiff brought suit against the City, various police officers,
     and Gracie University. ..................................................................... 13

Standard of Review .................................................................................. 14

Summary ................................................................................................... 16

Argument .................................................................................................. 17

I.   Plaintiff's excessive force claim fails because Mr. Kennedy
     voluntarily participated in the self-defense simulation as part of
     his employment. ............................................................................... 17

     A.   Employment, including employment with a public entity,
          is not a Fourth Amendment seizure. ..................................... 19

     B.   Mandatory self-defense training for police officers is not
          a Fourth Amendment seizure. .............................................. 22

C.    Mr. Kennedy consented to his employment with the City, to his training to become a police officer, and to the self-defense exercises that were a mandatory part of that training program. ..................................................................28

II.    Mr. Kennedy's medical emergency did not render him the equivalent of an incarcerated or institutionalized person and, moreover, no one was deliberately indifferent to his medical needs. ..............................................................................29

Conclusion .........................................................................33

Certificate of Service .............................................................35

Certificate of Compliance .......................................................35

# TABLE OF AUTHORITIES

## Cases

*Aguilera v. Baca*, 510 F.3d 1161 (9th Cir. 2007) ....................................21

*Anderson v. Estrada*, 140 F.4th 634 (5th Cir. 2025) ...............................14

*Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023)...................................14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................14

*Columbia Sussex Corp. v. Hay,* 627 S.W.2d 270 (Ky. 1981)..................21

*DeShaney v. Winnebago County Dep't of Soc. Svcs.*, 489 U.S. 189
    (1989) ......................................................................................................29

*Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752 (5th Cir. 2001)......................30

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) ...........14

*Driebel v. City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002)........................... 20, 22

*Estelle v. Gamble*, 429 U.S. 97 (1976) ......................................................29

*Faniel v. Chesapeake & Potomac Tel. Co.,* 404 A.2d 147 (D.C. Ct.
    App. 1979) ..............................................................................................21

*Feirson v. District of Columbia*, 506 F.3d 1063 (D.C. Cir. 2007) ....... 25, 26, 27, 28

*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir.
    2006) ........................................................................................................14

*Florida v. Bostick*, 501 U.S. 429 (1991) ...................................................19

*Foley v. Polaroid Corp.*, 508 N.E.2d 72 (Mass. 1987)............................21

*Fournier v. Reardon*, 160 F.3d 754 (1st Cir. 1998)................................... 23, 24, 25

*Graham v. Connor*, 490 U.S. 386 (1989) .................................... 17, 18, 22

*Gwynn v. City of Philadelphia*, 719 F.3d 295 (3d Cir. 2013)..................20

*Hanna v. Marshall Field & Co.*, 665 N.E.2d 343 (Ill. App. Ct. 1996) ..................21

*Harmon v. City of Arlington*, 16 F.4th 1159 (5th Cir. 2021)............................ 14, 15

*I.N.S. v. Delgado*, 466 U.S. 210 (1984) .......................................... 18, 19

*Johnson v. Treen*, 759 F.2d 1236 (5th Cir. 1985)....................................30

*Kelley v. Johnson*, 425 U.S. 238 (1976) ...................................................22

*McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (en banc)..............................................................................................29

*Miraliakbari v. Pennicooke*, 561 S.E.2d 483 (Ga. App. Ct. 2002) .......................21

*Moen v. Las Vegas Int'l Hotel, Inc.,* 90 Nev. 176, 521 P.2d 370 (1974) ...............21

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).................................................................................... 13, 16

*Pennington v. Metro. Gov't of Nashville & Davidson County*, 511 F.3d 647 (6th Cir. 2008) ...............................................................21

*Reyes v. Maschmeier*, 446 F.3d 1199 (11th Cir. 2006) ...........................................21

*Rhodes v. Prince*, 360 Fed. Appx. 555 (5th Cir. 2010) ..........................................20

*Rhodes v. Prince*, Civil Action No. 3:05-CV-2343-D, 2007 WL 431049 (N.D. Tex. Feb. 8, 2007)......................................................21

*Ristow v. Hansen*, 719 Fed. Appx. 359 (5th Cir. 2018)..........................................20

*Scott v. Harris*, 550 U.S. 372 (2007) ......................................................................15

*Stapleton v. Lozano*, 125 F.4th 743 (5th Cir. 2025) ......................................... 30, 33

*Tennessee v. Garner*, 471 U.S. 1 (1985)..................................................................18

*Terry v. Ohio*, 392 U.S. 1 (1968) .............................................................................18

*United States v. Baird*, 851 F.2d 376 (D.C. Cir. 1988) ..........................................20

*United States v. Chavez*, 281 F.3d 479 (5th Cir. 2002) .................................... 19, 29

*United States v. Leese*, 176 F.3d 740 (3d Cir. 1999) ...............................................20

*United States v. Mahan*, 190 F.3d 416 (6th Cir. 1999)...........................................20

*United States v. Mendenhall*, 446 U.S. 544 (1980) .................................................18

*United States v. Muegge*, 225 F.3d 1267 (11th Cir. 2000) ......................................20

*Winder v. Gallardo*, 118 F.4th 638 (5th Cir. 2024)................................................15

**Statutes**

42 U.S.C. § 1983 .......................................................................................................17

**Rules**

5th Cir. Rule 28.2.1 ..................................................................................................... i

Fed. R. App. P. 25......................................................................................................35

Fed. R. App. P. 32......................................................................................................35

Fed. R. Civ. P. 12 ......................................................................................................14

**Constitutional Provisions**

U.S. Const. amend. IV ............................................................................18

## ISSUES PRESENTED

Marquis Kennedy was a police recruit participating in the Arlington Police Academy. Successful completion of the Academy requires participation in self-defense training exercises. While participating in one such training exercise, Mr. Kennedy suffered a heart-related medical emergency. A video of the entire training exercise is part of the record on appeal. The issues presented are:

1.    Whether Mr. Kennedy's voluntary participation in the training exercise forecloses this Fourth and Fourteenth Amendment "seizure" claim, even though participation was a condition of continued employment.

2.    Whether (a) the police officers did not owe a special constitutional duty to Mr. Kennedy because he was neither an incarcerated nor institutionalized individual, and, regardless, (b) the police officers were not deliberately indifferent to Mr. Kennedy's serious medical needs.

## STATEMENT OF THE CASE

Because this is an appeal from the grant of a motion to dismiss, the City of Arlington's statement of the case is limited to (1) Plaintiff's Second Amended Complaint, (2) the exhibits attached to Plaintiff's Second Amended Complaint, and (3) a video of Marquis Kennedy's self-defense simulation on September 23, 2022. In regard to the video, Plaintiff explicitly relied on and discussed the video in her Complaint. ROA.492 [Pltf's 2d Am. Compl ¶31 n.2]; ROA.535–39 [Exh. E to Pltf's 2d Am. Compl.] (unsigned "affidavit" that purports to describe what was viewed in the video recording). In addition, Plaintiff did not object to its inclusion in her response to the City's motion to dismiss, her objections to the Magistrate Judge's report and recommendations, nor in her appellate brief. *See* ROA.716 (response to the City's motion to dismiss); ROA.824 (response to the individual defendants' motion to dismiss); ROA.875 (objections to report and recommendations); ROA.915 (reply on objections to report and recommendation).

## I.    Mr. Kennedy was an employee of the City of Arlington being trained at the Arlington Police Academy to become a police officer.

Marquis Kennedy began as a police recruit in the Arlington Police Department in late July 2022. ROA.531 [Pltf's 2d Am. Compl., Exh. E]; ROA.523 [Pltf's 2d Am. Compl., Exh. C]. As part of the application process, Mr. Kennedy performed, and passed, a pre-employment physical examination on May 20, 2022. ROA.490 [Pltf's 2d Am. Compl. ¶24]; ROA.521 [Pltf's 2d Am. Compl., Exh. B]. The recruit

training in the Police Academy included classroom coursework (e.g., "History of Policing," "Procedural Justice," and "Professionalism and Ethics") as well as training that occurred in a gym (e.g., "Physical Assessment 1," "Physical Training," and "Fitness and Wellness"). ROA.523 [Pltf's 2d Am. Compl., Exh. C]; *see also* ROA.507 [Pltf's 2d Am. Compl. ¶86] ("Physical Training and Defensive Tactics") and ROA.508 [*Id.* at ¶89] ("cadets were exposed to MMA and jiu-jitsu tactics").

Ten weeks into the sixteen-week training program, during the week of September 19-22, 2022, the cadets were training for what Plaintiff refers to as the "fight for your life" simulation, which was scheduled for Friday, September 23, 2022. ROA.485 [Pltf's 2d Am. Compl.]; ROA.491 [*Id.* at ¶27]. Plaintiff alleges that successful completion of the "fight for your life" simulation was effectively a requirement for successful completion of the Police Academy. ROA.492 [Pltf's 2d Am. Comp. ¶30].

During the week of September 19-22, 2022, Plaintiff alleges that Monday consisted of supervised wrestling sessions and totaled seven (7) hours of training. Tuesday continued the wrestling sessions for another four (4) hours. There was apparently no physical training on Wednesday or Thursday. *Id.*[1] Plaintiff also alleges that, in the two weeks prior to the simulation exercise, the cadets received

---

[1] *See also* ROA.537 (Mrs. Kennedy states that she was told that on Wednesday and Thursday there was no physical training.).

approximately 20 hours of training on the tested techniques. ROA.539 [Pltf's 2d Am. Compl., Exh. E].

Plaintiff alleges that, on Thursday, the instructors "were aware of the poor physical condition" of Mr. Kennedy and of some sort of injuries he had allegedly incurred. ROA.491 [Pltf's 2d Am. Compl. ¶28]. Plaintiff's Complaint never explains the nature of these alleged injuries. Mrs. Kennedy, however, states that Mr. Kennedy had told her that week that "he was bruised from rolling around on a mat all day." ROA.539.[2]

Plaintiff's Complaint provides an entirely unexplained allegation that cadets aged 35 and older were treated differently from younger cadets. ROA.491 [Pltf's 2d Am. Compl. ¶26].[3] Plaintiff has not alleged how or in what manner there is an alleged difference in treatment, and, perhaps tellingly, has not alleged any form of age discrimination claim. *See* ROA.499–511 [Pltf's 2d Am. Compl. ¶¶56–106]. Plaintiff's brief, on the other hand, includes an entirely new allegation: that the "fight

---

[2] *See also* ROA.552 [Pltf's 2d Am. Compl., Exh. I] (The Medical Examiner's investigation narrative includes a copy of what is apparently an email from Mrs. Kennedy, in which she states, "Marquis complained of being bruised earlier in the week in which if you are wrestling this can be expected or it could have been an indication of something." (grammatical errors original)).

[3] At the end of the paragraph alleging that older cadets were treated differently, Plaintiff's Complaint cites to a news article, but the newspaper article includes no allegations regarding a difference in treatment of older and younger cadets. *See* ROA.524–29. Several paragraphs later, Plaintiff's Complaint *does* include a general allegation that "Favored Cadets easily coast through the [fight for your life] simulations, but disfavored Cadets are subjected to ferocious physical attacks by the instructors." ROA.492 [Pltf's 2d Am. Compl. ¶30]. Plaintiff does not allege why some cadets might have been more favored than others, and, perhaps most significantly, does not allege that Mr. Kennedy was a disfavored cadet. *See generally* ROA.484–514 [Pltf's 2d Am. Compl.]

for your life" simulation was only for cadets aged 35 or older. Kennedy Br. at 5 (citing ROA.490-91). This new allegation in Plaintiff's appellate brief is contradicted by Plaintiff's Second Amended Complaint, which states, "The schedule for the week of September 19-22, 2022, required the cadets, including Officer Kennedy, to train for the 'fight for your life' simulation, scheduled for Friday September 23, 2022," ROA.491 [Pltf's 2d Am. Compl. ¶27] (emphasis added), and "The 'fight for your life' is a requirement for Cadets. … Cadets who do not or cannot complete the simulations consecutively are forced out of the Academy. … Each Cadet moves through the simulations alone." ROA.492 [*Id.* at ¶30].

Plaintiff's appellate brief also alleges that this "fight for your life" training was unpublished, not part of the standard protocol, and conducted after hours. Kennedy Br. at 5 (citing ROA.491). This allegation is directly contradicted by Plaintiff's Complaint, which alleges that the fight simulation was "scheduled for February, September 23, 2022," and Mr. Kennedy's simulation occurred from approximately 10:00 a.m. until approximately 10:16 a.m. ROA.491 [Pltf's 2d Am. Compl. ¶¶27, 29]. Plaintiff might be confusing her allegation about the in-class fight simulation with her allegation that Mr. Kennedy (and his entire recruit class) was allegedly required, on Thursday, to participate in "after-hours, rigorous physical activity" because he had been "unable to remain upright and alert during classes"

that day. ROA.491 [Pltf's 2d Am. Compl. ¶27.d] ("This activity was not published in the Cadet training schedule and occurred when Cadets fell asleep during class.").[4]

## II. Ten weeks into a sixteen-week training program, Mr. Kennedy participated in a self-defense simulation as part of his police training.

On September 23, 2022, Mr. Kennedy participated in a self-defense simulation. ROA.384 [Video]. The video begins with Mr. Kennedy walking to a padded mat and laying down on the ground. *Id.*

In the first simulation, Mr. Kennedy is lying on his back on the ground with one of the training officers on top of him. *Id.* [Video 0:00:12–0:03:40]. From the video, the purpose of the simulation appears to be for the recruit to demonstrate how to prevent an attacker from punching the officer while he is down. Mr. Kennedy can be seen pulling the training officer down on top of Mr. Kennedy. Likewise, the training officer can be seen attempting to get some distance between the two of them, as would be required for an attacker to successfully hit or punch a fallen officer. The training officer demonstrates that he could punch Mr. Kennedy by sometimes touching or coming close to touching Mr. Kennedy with his gloves and by sometimes pounding on the mat. After the first simulation is completed, Mr.

---

[4] Mrs. Kennedy states, "In addition to the training, recruits had additional punishments for violating rules. Punishments include '5 O'Clock Club' and Base violations. These were in addition to the recruits additional duties of cleaning, physical training, and book training. I was told that the class had received a 5 O'Clock club because Marquis had fell asleep in class." ROA.537 (typos original).

Kennedy walks back to the center of the mat in preparation for the second simulation. *Id.* [Video 0:03:45–55]

In the second simulation, Mr. Kennedy starts by laying on his back on the ground with one of the training officers on top of him. *Id.* [Video 0:03:98–0:09:15]. From the video, the purpose of the simulation appears to be for the recruit to demonstrate how to escape from an attacker. Mr. Kennedy demonstrates flipping the training officer over in different ways and then getting up. The training officers coach Mr. Kennedy throughout, encouraging him to use technique rather than strength, and on one occasion stopping the simulation to instruct Mr. Kennedy to use a specific technique. The training officer occasionally demonstrates that he could punch Mr. Kennedy by sometimes touching or coming close to touching Mr. Kennedy with his gloves. At the conclusion of the second simulation, Mr. Kennedy can be seen walking to a different area of the mat in preparation for the third simulation. *Id.* [Video 00:09:15–25].

In the third simulation, Mr. Kennedy again is laying on his back on the ground with one of the training officers on top of him. *Id.* [Video 0:09:41–0:14:22]. From the video, the purpose of the simulation appears to be for the recruit to gain control of the attacker and push the attacker away with his legs. Mr. Kennedy uses some of the same techniques in the first and second simulation to gain control of the attacker (e.g., pulling the attacker down onto and closer to Mr. Kennedy), but then Mr.

Kennedy uses his legs to move the training officer into a position that the training officer can be pushed away such that an attacker would not be able to do substantial harm to an officer. As before, there is coaching throughout and, on one occasion, the simulation is again stopped to provide specific coaching advice to Mr. Kennedy. Once again, the training officer demonstrates that he could punch Mr. Kennedy by sometimes touching or coming close to touching Mr. Kennedy with his gloves and pounding on the mat. At the conclusion of the third simulation, Mr. Kennedy gets up and moves to the corner of the mat in preparation for the fourth simulation. *Id.* [Video 0:14:35–55].

In the fourth simulation, Mr. Kennedy and the training officer are both standing. *Id.* [Video 0:14:45–0:15:30]. Mr. Kennedy asks the training officer "for his ID." The training officer hands the orange "ID" to Mr. Kennedy, but then immediately simulates attacking Mr. Kennedy, and Mr. Kennedy drops the "ID." It is unclear precisely what technique Mr. Kennedy was supposed to use to stop the "attacker," but at one point he grabs the training officer, presumably to stop the simulated attack. Throughout, the training officer demonstrates that he could hit or punch Mr. Kennedy by sometimes touching or coming close to touching Mr. Kennedy with his gloves.

Plaintiff alleges that recruits were given an "officer in distress" card to drop if they were unable to continue. ROA.492 [Pltf's 2d Am. Compl. ¶30]. Plaintiff goes

on to allege that, during the fourth simulation, Mr. Kennedy dropped his "officer in distress" card, but that the training officer pushed the card away and continued with the simulation. ROA.494 [Pltf's 2d Am. Compl. ¶31]. However, Plaintiff's allegation that Mr. Kennedy dropped an "officer in distress" card is not plausible. First, from the video, it is evident that the card in question is the "ID" that the training officer hands to Mr. Kennedy as part of the simulation. ROA.384 [Video 0:14:57–0:15:15]. Second, Plaintiff's Complaint alleges that the description of the self-defense simulation comes from Mrs. Kennedy's "affidavit," but Mrs. Kennedy does not mention any alleged "officer in distress" card. ROA.531–41; ROA.492 [Pltf's 2d Am. Compl. ¶31 and n.2] (stating that description of what occurred during simulations comes from the affidavit of Mrs. Kennedy based on her viewing of the recording).

Before the simulation is over, one of the training officers stops the simulation. The following interchange occurs:

> Training Officer[5]:  Pause. Pause. Pause.
>
> [Mr. Kennedy rests against the wall, leaning forward at the waist. Four training officers are nearby.]
>
> Training Officer:   Do you need an ambulance?
>
> Mr. Kennedy:        [Shakes head.]

---

[5] Plaintiff identifies this training officer as Officer Patrick Knight. ROA.494 [Pltf's 2d Am. Compl. ¶31.d].

Training Officer:    Are you ok to continue?

Mr. Kennedy:    [Nods head.] I need water.

Training Officer:    You need water?

Mr. Kennedy    [Nods head.]

Training Officer:    You can't get water in a fight. Are you ok to continue?

Mr. Kennedy:    [No response.]

Training Officer:    Because [inaudible]. Stand up and get your airways open.

[Training Officers help Mr. Kennedy stand straight, but still resting against the wall.]

Training Officer:    Look at me. Are you ok? Look at me. I'm trying to see your eyes.

[An additional training officer joins the group with Mr. Kennedy.]

Other Officer:    Hands above your head, man.

Training Officer:    Are you able to continue?

[Mr. Kennedy bends back over and apparently shakes his head or responds 'no.']<sup>6</sup>

Training Officer:    No? Alright, we're done. Come on. Let's go get some water.

[Mr. Kennedy appears to stumble, but the training officers support him. Two training officers help Mr. Kennedy walk off the mat, and out of range of the video camera.]

ROA.384 [Video 0:15:30–0:16:12].

---

[6] ROA.537 (Mrs. Kennedy states that in response to this question, "Marquis says No").

**III.    During the self-defense simulation, Mr. Kennedy suffered a heart-related medical emergency, and passed away a couple days later.**

Mr. Kennedy was allegedly taken to a chair in the breakroom after his self-defense simulation was ended. ROA.491 and 494 [Pltf's 2d Am. Compl. ¶¶29, 32–33]. Mrs. Kennedy states that the "breakroom is across the hall from the gym so it was a short way there and he was sat down in a chair to rest where I was told he asked for water and after taking a few swigs of water he had lost consciousness." ROA.537. Mrs. Kennedy states that the first simulation "is assumed to have begun somewhere between 10am-10:15am." ROA.536. Plaintiff's Complaint, on the other hand, states that it began at "approximately 10:00 a.m." ROA.491 [Pltf's 2d Am. Compl. ¶29]. Based on the fact that Corporal Bateman called 9-1-1 at 10:24 a.m., and the video of the simulation lasts approximately sixteen minutes, it would appear that the video and the simulation must have started between 10:00 a.m. and 10:08 a.m., with Mr. Kennedy finishing the simulation before Corporal Bateman's 9-1-1 call at 10:24 a.m.

Corporal Shelly Bateman called 9-1-1 at 10:24 a.m. and requested Emergency Medical Services (EMS). ROA.494 [*Id.* at ¶35]. Corporal Bateman called 9-1-1 again at 10:28 a.m., reporting that Mr. Kennedy was not breathing, and that they had begun cardiopulmonary resuscitation (CPR) and were attempting to use the automated external defibrillator (AED) to revive him. ROA.495 [*Id.* at ¶36]. An officer called 9-1-1 a third time at 10:36 a.m. to request to be updated when EMS

11

will arrive. *Id.* [*Id.* at ¶38]. Plaintiff alleges, without explanation, that for a period exceeding 5 minutes, Mr. Kennedy "did not receive proper first aid." *Id.* [*Id.* at ¶¶34, 37]. Plaintiff further elaborates, alleging that during the alleged 5-minute time-period, Mr. Kennedy "either received no CPR, or received CPR performed so poorly that it provided him with no oxygen." ROA.509 [*Id.* at ¶95].

The Emergency Medical Technicians (EMTs) arrived shortly thereafter, and their notes, made around 10:40 a.m., state that Mr. Kennedy was suffering from respiratory failure. *Id.* [*Id.* at ¶40]. Around 10:50 a.m., the EMTs were able to resuscitate Mr. Kennedy using oral intubation. *Id.* [*Id.* at ¶41].

Mr. Kennedy was transported to the Emergency Room, and arrived there at 11:09 a.m. ROA.496 [*Id.* at ¶43]. Plaintiff admits that the medical staff in the ER were not deliberately indifferent to Mr. Kennedy's medical needs. *Id.* Nevertheless, Mr. Kennedy never regained consciousness and died two days later. ROA.496–7 [*Id.* at ¶¶44, 49].

Mr. Kennedy's death certificate lists the primary cause of death as "unknown etiology of cardiac arrest, but possible atherosclerotic cardiovascular disease and secondary cause of death as natural causes." ROA.498 [*Id.* at ¶52]. The Office of the Medical Examiner noted that there was "[n]o apparent trauma" and that Medical City Arlington, where Mr. Kennedy was taken, had also stated that there was "[n]o trauma found or noted." ROA.546, 548.

**IV.    Plaintiff brought suit against the City, various police officers, and Gracie University.**

Plaintiff brought suit against the City, various police officers, and Gracie University. ROA.1. Plaintiff's Second Amended Complaint alleges claims against the police officers for alleged violation of Mr. Kennedy's Fourth and Fourteenth Amendment rights, and against the City pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). ROA.499, 505. Plaintiff's description of these claims is not always clear, but appears to involve allegations that the self-defense simulation violated Mr. Kennedy's "Fourth Amendment right to be free from excessive force" and his "Fourteenth Amendment right to bodily integrity." ROA.499. Plaintiff also appears to allege that Mr. Kennedy's Fourteenth Amendment rights were violated by deliberate indifference to Mr. Kennedy's serious medical needs. ROA.503.

The City and the police officers filed motions to dismiss. ROA.628, 778. The Magistrate Judge issued findings and recommendations, concluding that Plaintiff had not alleged a viable constitutional claim and recommending dismissal of all claims against the police officers and, since there was no predicate constitutional violation for municipal liability, all claims against the City. ROA.851. The district court adopted the report and recommendation. ROA.924.

### STANDARD OF REVIEW

This court reviews *de novo* a district court's grant of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. *Anderson v. Estrada*, 140 F.4th 634, 641 (5th Cir. 2025) (citing *Harmon v. City of Arlington*, 16 F.4th 1159, 1162 (5th Cir. 2021)).

"Generally, a court ruling on a motion to dismiss may rely on only the complaint and its proper attachments." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "But this court does not presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (quotation marks and citations omitted). And "while "the court accepts 'all well-pleaded facts as true and draw[s] all reasonable inferences in favor of the nonmoving party,'" "the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Winder v.*

14

*Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (quoting *Harmon*, 16 F.4th at 1162–63 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (cleaned up)).

## SUMMARY

The district court's dismissal should be affirmed because the district court correctly held that the plaintiff has failed to state a claim upon which relief may be granted.[7]

Marquis Kennedy was a voluntary participant in a self-defense exercise that was a mandatory part of his training to become an Arlington police officer. During the exercise, Mr. Kennedy experienced a medical emergency and chose to terminate the training exercise. The police officers who were present provided Mr. Kennedy with emergency medical assistance until an ambulance arrived. Sadly, Mr. Kennedy passed away two days later.

Mr. Kennedy's family alleges that his constitutional rights were violated by alleged excessive force and alleged failure to provide adequate medical care. Both claims require Plaintiff to demonstrate that the person—in this case, Mr. Kennedy—was 'seized,' incarcerated, or institutionalized. Mr. Kennedy was neither 'seized,' incarcerated, nor institutionalized. He was an employee at work participating in mandatory training to prepare him for one of the dangers that police officers face—violent attackers. Those federal appellate courts that have considered such claims have rejected them. This Court should do likewise.

---

[7] Because the district court concluded that Plaintiff had failed to state a valid constitutional violation, it did not reach the City's additional argument that Plaintiff failed to establish municipal liability under *Monell*.

**ARGUMENT**

## I.    Plaintiff's excessive force claim fails because Mr. Kennedy voluntarily participated in the self-defense simulation as part of his employment.

A person who voluntarily participates in a martial arts competition generally does not have a valid tort claim for imprisonment or assault, even if injured while fighting in the competition. Similarly, Mr. Kennedy does not have a valid excessive force claim premised on his voluntary participation in the Arlington Police Academy and the specific self-defense simulation during which he had a medical emergency.

Plaintiff alleges that Mr. Kennedy was subject to excessive force during the self-defense simulation that he participated in as a police recruit. There is no "generic 'right' to be free from excessive force, grounded not in any particular constitutional provision but rather in 'basic principles of § 1983 jurisprudence.'" *Graham v. Connor*, 490 U.S. 386, 393 (1989). "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Id.* at 394. The validity of an excessive force claim "must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." *Id.* So as to leave no doubt as to the logical consequences of these principles, the Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under

the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395 (emphasis original).[8]

The Fourth Amendment "protects the right of the people to be secure from unreasonable searches and seizures." U.S. Const. amend. IV. "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). But "[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). In summary, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

---

[8] Plaintiff sometimes appears to argue that the "deliberate indifference" standard and the Fourteenth Amendment provide an appropriate means for analyzing her excessive force claim. *See* Kennedy Br. at 22. While 'deliberate indifference' is an appropriate standard in the context of the obligation to care for incarcerated individuals (see discussion below at section II), excessive force claims are a type of 'seizure' and are analyzed under the Fourth Amendment. *See Graham*, 490 U.S. at 393–95.

### A. Employment, including employment with a public entity, is not a Fourth Amendment seizure.

Employment does not constitute a seizure. "As the Supreme Court observed…, 'when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers.'" *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002) (quoting *Delgado*, 466 U.S. at 218). Employment, with the obligations of an employee to his or her employer, is, rather, "a factor independent of police conduct" and does not create a 'seizure' under the Fourth Amendment. *Chavez*, 281 F.3d at 483 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). A 'seizure' in the employment context only can arise if "all the circumstances surrounding the encounter [lead to the conclusion that] the officers' conduct would have caused a reasonable person to believe that he was not free to ignore the police presence and go about his business." *Chavez*, 281 F.3d at 483.

The fact of public employment does not change the authority of an employer nor expand the reach of the Fourth Amendment.

> [N]othing in the Fourth Amendment endows public employees with greater workplace rights than those enjoyed by their counterparts in the private sector. Thus, in cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state.

*Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002) (holding police department has the authority to order officers to remain on duty or accompany detectives so as to answer questions or invoke their Fifth Amendment rights); *Rhodes v. Prince*, 360 Fed. Appx. 555, 559–60 (5th Cir. 2010) (adopting the reasoning of *Driebel*); *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (supervisor's order to Air Force employee to report for an interview was not a Fourth Amendment seizure); *United States v. Mahan*, 190 F.3d 416, 421 (6th Cir. 1999) (defendant not in custody despite being summoned to interview by work supervisor); *United States v. Leese*, 176 F.3d 740 (3d Cir. 1999) (postal employee interview not custodial despite postmaster's order to speak with postal inspectors in the postmaster's office); *United States v. Baird*, 851 F.2d 376, 380 (D.C. Cir. 1988) (Coast Guard officer's interview not custodial despite order by his superior officer to appear for an interview with a Treasury Department investigator).

"[T]he possibility or even probability of a future adverse employment action—as opposed to physical detention—cannot enter our analysis of whether the officers in this case were seized." *Driebel*, 298 F.3d at 642; *Ristow v. Hansen*, 719 Fed. Appx. 359, 363–64 and n.17 (5th Cir. 2018) (rejecting claim that supervisor's threat to file criminal charges if the plaintiff did not resign employment constituted a 'seizure' under the Fourth Amendment); *Gwynn v. City of Philadelphia*, 719 F.3d 295, 302 (3d Cir. 2013) (No Fourth Amendment violation because, "to the extent

Appellants felt compelled to obey their superior officers' commands, that compulsion was borne out of their employment relationship."); *Pennington v. Metro. Gov't of Nashville & Davidson County*, 511 F.3d 647, 652 (6th Cir. 2008) ("A person is not seized simply because he believes that he will lose his job."); *Aguilera v. Baca*, 510 F.3d 1161, 1169 (9th Cir. 2007) ("[T]he Fourth Amendment does not protect against the threat of demotions or job loss."); *Reyes v. Maschmeier*, 446 F.3d 1199, 1205 (11th Cir. 2006) ("Although Reyes claims that she felt like she was not able to leave the meeting, those claims are based in the supervisor-employee relationship and are therefore not indicators that something more had transformed the meeting into a Fourth Amendment seizure."); *Rhodes v. Prince*, Civil Action No. 3:05-CV-2343-D, 2007 WL 431049, at *7–8 (N.D. Tex. Feb. 8, 2007) (Police officer who risked losing his job if he failed to comply with internal investigation interview was nevertheless "free to refuse to come to the police station in the first place or to leave the police station once questioning began.").[9] If a police officer declines to cooperate

---

[9] *Cf. Miraliakbari v. Pennicooke*, 561 S.E.2d 483, 489 (Ga. App. Ct. 2002) (rejecting employee's argument that "the threat of loss of a job constitutes sufficient force or fear to form the basis of a claim for false imprisonment."); *Hanna v. Marshall Field & Co.*, 665 N.E.2d 343, 349 (Ill. App. Ct. 1996) ("The restraint that results merely from a plaintiff's fear of losing his job or belief that he would be fired immediately if he left the room is insufficient as a matter of law to make out a claim of false imprisonment."); *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 77–78 (Mass. 1987) ("We know of no case that holds that a threat of discharge from employment at will can effect imprisonment for tort purposes."); *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 277–278 (Ky. 1981) ("certainly the restraint evidenced by one's interest in retaining an untenured position must ... fall short of the standard necessary to prove false imprisonment"); *Faniel v. Chesapeake & Potomac Tel. Co.,* 404 A.2d 147, 152 (D.C. Ct. App. 1979) ("fear of losing one's job, although a powerful incentive, does not render involuntary the behavior induced"); *Moen v. Las Vegas Int'l Hotel, Inc.,* 90 Nev. 176, 177, 521 P.2d 370 (1974) ("Apprehension that one might

with an investigation or refuses to obey a lawful command by a superior officer or report for questioning at police headquarters, "he exposes himself to the same potential consequences as an employee in the private sphere: suspension, termination, or other work-related discipline, such as being placed on administrative leave pending an investigation of the charges against him." *Driebel*, 298 F.3d at 639.

### B.     Mandatory self-defense training for police officers is not a Fourth Amendment seizure.

Mandatory self-defense training, and its accompanying testing, is not a Fourth Amendment seizure. "The promotion of safety of persons and property is unquestionably at the core of the State's police power, and virtually all state and local governments employ a uniform police force to aid in the accomplishment of that purpose." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976). Such police departments are "paramilitary[s] organization that must maintain the highest degree of discipline, confidentiality, efficiency, and *espirit de corps* among its officers, who are the first line of defense against lawlessness." *Driebel*, 298 F.3d at 638–39. And "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. It is common sense that police officer recruits would be trained in how to engage in physical altercations, and would

---

in the future lose one's job ... is not force or the threat of force which is necessary to establish false imprisonment").

need to show their ability to use appropriate self-defense techniques before they are permitted to serve as police officers.

Few courts have directly addressed Plaintiff's theory, i.e., Plaintiff's claim that the self-defense training required for police officer recruits should be considered 'excessive force' so as to constitute a Fourth Amendment seizure claim. The two federal courts of appeals that have addressed Plaintiff's theory have rejected it. This Court should do likewise.

In *Fournier v. Reardon*, the First Circuit Court of Appeals held that a law enforcement trainee was not 'seized' under the Fourth Amendment when he suffered injuries while handcuffed as part of the basic training academy course. 160 F.3d 754, 757 (1st Cir. 1998). Mark Fournier was attending a nine-week basic training course which the Essex County Sheriff's Department required for full-time employment as a corrections officer. *Id.* at 756.

On the second day of training, Mr. Fournier was ordered to report to the academy training staff's office. Department protocol required him to knock, announce is his presence, and request permission before entering the instructor's office. Mr. Fournier, however, entered the office unannounced. *Id.* As punishment for this breach of protocol, Mr. Fournier was ordered to turn around and the drill instructor placed handcuffs on his wrists and informed him that he was being placed under 'house arrest.'' Mr. Fournier was then ordered back to the classroom. *Id.* When

the drill instructor arrived at the classroom about five minutes later, the recruits, including Mr. Fournier, rose to attention as protocol required. "When the drill instructor ordered the class to be seated, Fournier attempted to seat himself. Unfortunately, Fournier missed his chair and fell to the ground, allegedly sustaining serious personal injuries, including a fractured vertebra." *Id.*

Mr. Fournier argued that, "when the drill instructor placed him under 'house arrest' and handcuffed him behind his back, he was seized for purposes of Fourth Amendment analysis." *Id.* at 757. The First Circuit rejected Mr. Fournier's Fourth Amendment claim, explaining,

> Although Fournier was handcuffed, no evidence presented would support a finding that he was not free to leave at any point during the scenario. Fournier understood that 'house arrest' was part of the basic training academy course. He submitted to being handcuffed, and then returned to the classroom.

*Id.* The Court recognized that, if Mr. Fournier had objected to being handcuffed, "there could have possibly been negative consequences for his continued employment as a corrections officer. However, the possible effect that refusing to be handcuffed may have had on his employment status is not an issue for us to consider." *Id.* The question is whether his right to be free from seizure was violated.

> In view of all the circumstances surrounding the incident, a reasonable observer would conclude that Fournier was the subject of improper hazing, which might give rise to a state law claim based on tort or employment theories, but

> would not believe that Fournier was not free to call an end
> to the "house arrest" and have the handcuffs removed.

*Id.*[10]

In *Feirson v. District of Columbia*, the D.C. Circuit Court of Appeals held that a police officer who was injured during a mandatory fight simulation could not establish a Fourth Amendment claim because he was not seized when ordered to participate in the simulation, nor when he experienced the physical attack of the simulation. 506 F.3d 1063, 1066–68 (D.C. Cir. 2007). Bruce Feirson "sustained serious neck and lower back injuries during an 'attack exercise'" that was part of a Metropolitan Police Department (MPD) training program. *Id.* at 1064. MPD required its officers to be certified in use of a new type of baton, referred to as the "ASP." *Id.* at 1065. ASP training included classroom instruction, two to three hours of physical conditioning, drills on various strikes and deflection moves, and an "attack exercise." *Id.* "To successfully complete the attack exercise, the trainee had to use a foam-covered version of the ASP to fend off an instructor pretending to be a violent suspect." *Id.*

> The exercise was designed to simulate a "code orange"
> situation—one level below a situation in which an officer
> would be authorized to use deadly force. The attacker
> charged toward the trainee aggressively, using pulled

---

[10] Plaintiff has an on-going state law case seeking recovery relating to Mr. Kennedy's death pursuant to the Texas Workers' Compensation Act. That proceeding was filed on June 18, 2025, and is pending in state district court. *See In the Matter of Marquis Kennedy*, Cause No. DC-25-09475, 160th Judicial District Court, Dallas County, Texas.

> punches and kicks, and grabbing, wrestling, or throwing
> the trainee.

*Id.*

Mr. Feirson, "[c]oncerned about his back after hearing rumors that officers were being 'beaten and assaulted' during ASP training," asked his supervisor if he could avoid doing the training altogether in light of his prior back-related injuries.

> Feirson's supervisor, apparently unmoved by his concerns, handed him a written order to attend. After all, annual in-service training was required for MPD officers, and Feirson had been deemed fit for full duty after undergoing a medical examination two months earlier.

*Id.* Feirson participated in the ASP training on April 27, 2000. "Already winded from the preceding exercises," Feirson tried to minimize the extent to which the attacker could punch and kick him, but was instead told by the instructor to switch to using the ASP more. *Id.* "[T]he attacker pursued him, continuing to throw punches and kicks" and "struck Feirson in the face, causing his head to jerk backward." *Id.* The attacker ultimately stopped the exercise, concluding that Feirson "had enough." *Id.* It turned out that Feirson suffered serious neck and lower back injuries, requiring him to undergo spinal surgery, and he took a disability retirement due to the injuries. *Id.*

Mr. Feirson argued that he was 'seized' in violation of the Fourth Amendment when his supervisor ordered him to attend the annual in-service training, and also during the "attack exercise" itself. *Id.* at 1066. The Court of Appeals rejected both

26

theories. First, the Court explained that the mandatory in-service training cannot constitute a 'seizure' under the Fourth Amendment. "The relevant inquiry is whether a reasonable person would have believed he would be detained if he disobeyed his supervisor's order—not whether he feared negative consequences for his job." *Id.* at 1067. Second, the Court explained that Mr. Feirson was not 'seized' during the "attack exercise," noting that "Feirson submitted to the exercise, and no evidence would support a finding that the instructors would not have stopped if Feirson asked them to do so." *Id.* at 1068.

One of the panel judges explained that he would have gone further and held that Feirson's Fourth Amendment rights were not violated even if he could not have stopped the "attack exercise." *Id.* at 1070 (Williams, J., concurring). As Judge Williams explained,

> In any sort of military or quasi-military training, periods may arise when, as a practical matter, the nature of the training makes it impossible or at least extremely risky for trainees to leave…. Although the trainee cannot unilaterally decide to exit the exercise, the resulting confinement is one to which the trainee agreed when he chose to go ahead with the exercise. … Thus it is either a seizure made lawful by consent, or not a seizure at all within the meaning of the Fourth Amendment, a distinction of no consequence here.

*Id.* As the majority opinion pointed out, even though "the exercise was not geared to Feirson's fitness level, that was because it was designed to prepare police officers to handle real-life situations." *Id.* at 1067.

### C.     Mr. Kennedy consented to his employment with the City, to his training to become a police officer, and to the self-defense exercises that were a mandatory part of that training program.

Mr. Kennedy "was a smart, well-educated, qualified, and apparently healthy forty-year-old male" who was a cadet in the Arlington Police Academy. ROA.490. He had already participated in ten weeks of a sixteen-week training course. ROA.485. He was notified in advance that he would be participating in a self-defense simulation on Friday, September 23, 2022. ROA.491. The simulation consisted of four parts, each approximately four minutes in length, with a total length of less than twenty minutes. *See* ROA.493–94. During the simulation, "it was made clear to [Mr. Kennedy that] if he failed to continue, he would fail and must repeat the entire physical training program." ROA.492. Plaintiff alleges that Mr. Kennedy, "in fear of losing his livelihood, continued" with the simulation. ROA.493.

Whether the self-defense simulation is evaluated as a seizure made lawful by consent, or no seizure at all, the result is the same. *Cf. Feirson*, 506 F.3d at 1070 (Williams, J., concurring). Mr. Kennedy voluntarily entered the Arlington Police Academy. Mr. Kennedy voluntarily continued in the Arlington Police Academy. Mr. Kennedy chose to attend the Arlington Police Academy on the day of the self-defense simulation and chose to participate in that simulation. He can be seen in the video footage walking into the training area, walking to the each of the four simulations, and laying down or otherwise getting in the appropriate position for the

commencement of each simulation. Mr. Kennedy can also be seen being asked if he wants to continue and the fourth simulation is terminated, early, when Mr. Kennedy says he is not able to continue. Throughout the simulation exercises, Mr. Kennedy chose to continue for a reason independent of police action. *Chavez*, 281 F.3d at 483. And when he chose not to continue, the simulation ended. Because Mr. Kennedy chose to participate, the district court correctly held that Plaintiff's Fourth Amendment seizure claim fails.

## II. Mr. Kennedy's medical emergency did not render him the equivalent of an incarcerated or institutionalized person and, moreover, no one was deliberately indifferent to his medical needs.

Government officials, such as police and firefighters, regularly respond to emergencies and help to meet the medical needs of people in their communities. They do this as part of their service to their communities, not because they are required to do so by the Constitution. *Cf. DeShaney v. Winnebago County Dep't of Soc. Svcs.*, 489 U.S. 189, 196 (1989) (The "Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property."). It is only when the government 'seizes' a person, such as by incarceration or institutionalization, that government officials have a duty to avoid being deliberately indifferent to the serious medical needs of the individual. *Id.* at 198–200; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002) (en banc).

Mr. Kennedy was neither incarcerated nor institutionalized. Mr. Kennedy voluntarily participated in the Arlington Police Academy and in the self-defense simulation. Plaintiff alleges that Mr. Kennedy only participated for fear of termination of his employment, but, as explained in greater detail above, such participation remains voluntary. Regardless, even if Mr. Kennedy's participation in the training program, or his medical emergency, somehow rendered him like an incarcerated or institutionalized person, no one with the City was deliberately indifferent to Mr. Kennedy's serious medical needs.

"To succeed on a deliberate-indifference claim, the plaintiff must show that the officer: (1) subjectively knew of a substantial risk of serious harm to the detainee; and (2) responded to that risk with 'deliberate indifference.'" *Stapleton v. Lozano*, 125 F.4th 743, 749 (5th Cir. 2025) (citations removed). And deliberate indifference is an extremely high standard to meet. *Id.* It cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *Id.* "Rather, the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

From the point at which Officer Knight stopped the simulation to check on Mr. Kennedy, there was less than ten minutes before 9-1-1 was called the first time (though it may have been almost immediate), and less than twenty-five minutes (though it may have been less than sixteen minutes) before the EMTs arrived and took over providing Mr. Kennedy with medical treatment. According to Plaintiff's allegations, this is the chronology:

| | |
|---|---|
| 10:00 to 10:08 a.m.[11] | Simulation #1 Begins (3 minutes, 38 seconds)[12] |
| | Simulation #2 Occurs (4 minutes)[13] |
| | Simulation #3 Occurs (4 minutes)[14] |
| 10:16 to 10:24 a.m. | Simulation #4 Begins and Ends Early (25 seconds)[15] |

Office Knight's stopped Simulation #4 and asked Mr. Kennedy if he needed an ambulance. When Mr. Kennedy responded, 'no,' Officer Knight asked if Mr. Kennedy was safe to continue. Mr. Kennedy initially stated that he could continue, but upon further questioning, Mr. Kennedy told Officer Knight that he could not continue.[16]

(Mr. Kennedy walked, with assistance, to the break room)[17]

---

[11] ROA.491, 536.

[12] ROA.492–93.

[13] ROA.493.

[14] *Id.*

[15] ROA.494, 537.

[16] ROA.537; ROA.384 [Video 0:15:30–0:16:12].

[17] ROA.494.

| | |
|---|---|
| 10:24 a.m. | 1st Call to 9-1-1 (Mr. Kennedy described by Corporal Bateman as 'overheated')[18] |
| 10:28 a.m. | 2nd Call to 9-1-1 (Mr. Kennedy described by Corporal Bateman as not breathing and reporting that they had begun CPR and were attempting to use the AED to revive him)[19] |
| 10:36 a.m. | 3rd Call to 9-1-1 (an officer calls to make sure EMS is "waved" through the gate and asking for an update when they arrive)[20] |
| 10:40 a.m. | EMT present and treating Mr. Kennedy[21] |

Plaintiff claims in her appellate brief that Mr. Kennedy was denied medical care "to the point that he was deprived of oxygen for more than five minutes." Kennedy Br. at 31. Plaintiff elsewhere alleges that Mr. Kennedy "either received no CPR, or received CPR performed so poorly that it provided him with no oxygen." ROA.509 [*Id.* at ¶95]. Neither allegation is sufficient to establish that City personnel were deliberately indifferent to Mr. Kennedy's serious medical needs. Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent

---

[18] *Id.*

[19] ROA.495.

[20] *Id.*

[21] *Id.* (It is not clear from the allegations exactly when the EMTs arrived, but they were clearly present by 10:40 a.m., as Plaintiff alleges that they made notes at that time regarding their observations of Mr. Kennedy's condition.).

response to a substantial risk of serious harm. *Stapleton*, 125 F.4th at 749. Officer Knight made repeated efforts to determine whether Mr. Kennedy needed medical attention. Corporal Bateman called 9-1-1 and then called again when Mr. Kennedy's condition worsened. Another officer called 9-1-1 after that in order to make sure that the arrival of the ambulance was expedited. And from the point at which Officer Knight halted the self-defense simulation to when the EMTs were treating Mr. Kennedy was less than twenty-five minutes, and possibly less than sixteen minutes. The police officers repeated actions to assist Mr. Kennedy when he was in distress illustrate that they did not act with deliberate indifference.

## CONCLUSION

Because the district court correctly held that Plaintiff-Appellant's claims against the City should be dismissed, appellee requests that this Court affirm that decision.

Respectfully submitted,

*/s/ Joshua A. Skinner*

JOSHUA A. SKINNER
  *Assistant City Attorney*
State Bar No. 24041927
joshua.skinner@arlingtontx.gov

CYNTHIA WITHERS
  *Assistant City Attorney*
State Bar No. 00791839
cynthia.withers@arlingtontx.gov

ALEXANDER J. LINDVALL

*Assistant City Attorney*
State Bar No. 24139409
alexander.lindvall@arlingtontx.gov

CITY OF ARLINGTON
CITY ATTORNEY'S OFFICE
Post Office Box 90231, MS 63-0300
Arlington, Texas 76004-3231
(817) 459-6878 (phone)
(817) 459-6897 (facsimile)

*Counsel for Defendant-Appellee City of Arlington, Texas*

## CERTIFICATE OF SERVICE

This document has been served via the Court's electronic-filing system, in compliance with FED. R. APP. P. 25(b) and (c), on August 27, 2025, to all registered counsel of record, and has been filed with the Clerk of the Court.

*/s/ Joshua A. Skinner*
JOSHUA A. SKINNER

## CERTIFICATE OF COMPLIANCE

1.      This document complies with FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 7,701 words.

2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point typeface, except for footnotes, which are in Times New Roman 12-point typeface.

*/s/ Joshua A. Skinner*
JOSHUA A. SKINNER

Dated: August 27, 2025